George **FRAZIER**, Plaintiff,

v.

Anthony J. **CELEBREZZE**, Secretary of
Health, Education, and Welfare,
Defendant.

Civ. A. No. AC–1430.

United States District Court
E. D. South Carolina,
Aiken Division.

Jan. 5, 1965.

Solomon Blatt, Jr., Blatt & Fales, Barnwell, S. C., for plaintiff.

Terrell L. Glenn, U. S. Atty., for Eastern District of South Carolina, and Wistar D. Stuckey, Asst. U. S. Atty., Columbia, S. C., for defendant.

HEMPHILL, Chief Judge.

Action by George Frazier to review a "final decision" of the Secretary of Health, Education, and Welfare which disallowed his application for a period of disability and for disability insurance benefits under Sections 216(i) and 223 of the Social Security Act, as amended, 42 U.S.C. §§ 416(i) and 423.

Plaintiff, who filed his application for benefits on September 27, 1961, alleges that he became unable to work in April 1961 (later amended to May 17, 1960), as a result of injuries sustained in a fall while he was employed on a construction job; and that since May 1960, because of the injuries received in the fall, and a generally deteriorating physical condition, he has been totally and permanently disabled, and unable to engage in "any substantial gainful activity" within the meaning of the Act.

Plaintiff, who was born in 1910, is married and at the time of his application had two minor children living with him and his wife. All of his work experience has consisted of employment as a general laborer and every job has required his doing heavy manual labor. He has no special working skills and was at one time able to read and write to a limited extent, as he only finished the fifth grade in school; however, at the hearing, Frazier testified that because of poor vision he could no longer read or write at all. He testified that he was able to drive his pickup truck before his fall, but since his injury he was not able to change the gears with his injured right arm.

Plaintiff alleges that since his fall and resulting injury in May 1960 he has done no work of any kind, with the exception in 1962 of working two weeks in a saw mill where he swept floors and did other menial cleaning up tasks until he "couldn't able to go no longer," and three weeks later when he worked picking cotton for a day and a half, at the end of which time he had to be carried from the field to a doctor.

He says that he is unable to help his wife with work at home and that he could not dress himself without assistance in putting on his clothes. Plaintiff states that his days were spent lying around the house, listening to the radio, and walking to a very limited extent. He also testified that he was unable, at the time of the hearing, to walk from his home to the nearby community of Fairfax, a distance of approximately one mile.

Plaintiff's complaints consisted of inability to use his right arm and hand because of the injury suffered on May 17, 1960 (plaintiff is righthanded), pain in his right leg continuously, and, to some extent, pain in the left arm, pain in the back and right hip, and eye trouble, which was aggravated by bright lights, and which made it virtually impossible for him to read or write. It also appeared that plaintiff had been in the Medical College Hospital in Charleston, S. C., for suspected cancer and other conditions on four or five occasions during the past several years, and, at the time of the hearing, he was taking two kinds of pills, about every four hours, for pain and rest.

Testimony given by Annie Lou Frazier, wife of the plaintiff, and John Allen, a neighbor who saw plaintiff almost daily, substantiated his testimony regarding his incapacity to work, regarding his being in constant pain since his accident in May 1960, and regarding his inability to even assist his wife and children with duties around his home.

The following testimony from the record helps to illuminate the condition of the plaintiff relative to his allegation of disability:

"EXAMINER: Q. Are you right or left-handed?

"A. Right-handed, sir.

"Q. Do you have good motion in your right arm and right hand?

"A. No sir. I can't hold no grip with it, not at all. Pains all the time.

"Q. You have motion in the joints of your right arm?

"ATTORNEY BLATT: He means, George, can you move it around?

"CLAIMANT: Yes, I can move it, yes.

"ATTORNEY BLATT: Can you move your arm up to shoulder level?

"CLAIMANT: No sir.

"EXAMINER: Q. So you have restricted motion and no strength in your right arm and hand. Is that right?

"A. No, sir. No strength at all.

"Q. What causes the difficulty that you have with your right arm and right hand?

"A. Right arm and right hand, I couldn't grip nothing at all with it.

"Q. Has it always been that way or did something happen to it?

"A. Since I got my arm break, I couldn't get no grip to it since it's been break.

"Q. When did you break it?

"A. The time I fell.

"Q. That was when we were talking—May 17, 1960?

"A. Yes, sir.

"Q. What were you doing at that time?

"A. I was working.

"Q. What were you doing on the job?

"A. Wheeling a wheelbarrow."

There is conflict in the medical evidence, though most of the conflict seems to center on the conclusions, or opinions, of the doctors. Despite the fact that the opinions of physicians cannot be deemed conclusive of the ultimate issue, they are relevant and must be considered. Hanes v. Celebrezze, 337 F.2d 209, 214, F.N. 4 (4th Cir. 1964).

When plaintiff fell while at work on May 17, 1960, he sustained several fractures and dislocations of the right arm. These fractures and dislocations were reduced on that date by Dr. Luther M. Mace, a surgeon. On November 14, 1960 Doctor Mace removed bony outgrowth from the region of plaintiff's right elbow, and explored plaintiff's right radiohumeral joint (the joint connecting the radius with the humerous). It was hoped this operation would restore a full range of motion in plaintiff's right elbow joint and alleviate the pain in that joint, but Doctor Mace reported on January 9, 1961, the range of motion of plaintiff's right elbow joint was still limited to 45° to 130°, and plaintiff still complained of pain on extension of his elbow joint beyond 45°. Plaintiff, however, did have full pronation (turning in counterclockwise direction) and supination (turning in clockwise direction) of the forearm.

After examining plaintiff in January 1961, Doctor Mace thought he had reached maximum improvement, and the condition of his right elbow would probably worsen in the future as arthritis developed. In view of the limitation of motion in plaintiff's right arm and his work history as a laborer, Doctor Mace concluded that he had 95% permanent partial disability of the right arm. When he was examined again by Doctor Mace on September 28, 1961, he complained of pain in his right leg, but the doctor was unable to determine a physical basis for such pain. After this examination, Doctor Mace reported that plaintiff's condition was static.

Dr. Thomas J. Lattimore, also a surgeon, examined plaintiff on March 9, 1961, and found that his right elbow had a range of motion of 45° to 130°, with full pronation (except for a 10° loss) and supination of the forearm. Marked weakness on flexion of the hand and some limitation of the dorsal function of the wrist were noted. Doctor Lattimore concluded that there was 95% permanent partial disability of plaintiff's right arm, and 95% permanent total disability with respect to his work as a common laborer.

As an aid in its determination, the S. C. Vocational Rehabilitation Agency authorized X-rays and an orthopedic examination on December 18, 1961. The X-ray films showed evidence of fractures of the right arm with some secondary bone growth. The right hip disclosed no sign of bone or joint pathology, although several tiny foreign bodies of metallic density were present posteriorly in the soft tissues.

Doctor Robert R. McKnight, Jr., an orthopedic surgeon, reported that when he examined the plaintiff on December 18, 1961, he complained of stiffness in the right arm and pain in the back of the right hip. He was extremely tense and resisted all efforts at joint movement, but he walked with a straight spine and without a limp. His elbow flexed to 40° and extended to 168°. Doctor McKnight observed that plaintiff's right forearm and upperarm were approximately ¼″ larger in circumference than the left, implying that plaintiff had been adequately using the arm despite his allegations to the contrary. Doctor McKnight concluded that he saw no reason why the plaintiff was not capable of gainful employment, noting too, that there was a possibility that surgery might be necessary in the future to remove loose fragments in plaintiff's right elbow.

On January 8, 1963, plaintiff was examined at the cancer clinic of the Medical College of South Carolina. He complained of low back pain which did not radiate to the leg. Although there was some restriction in flexion of the back, no reflex changes were evident in the legs. The right arm was kept flexed at a 45° angle, and plaintiff stated he could not move it. He was referred to the Orthopedic Clinic, which estimated the impairment to his arm, wrist and hand, and back as 35%, 10%, and 15%, respectively. On a combined basis, the disability was said to be 25%–30% according to the North Carolina Industrial Scale. The cancer clinic reported on May 1, 1963, that no masses were seen by X-ray or palpation, and a follow-up was suggested in one year.

Dr. Cheves M. Smythe, of the S. C. Medical College Hospital, stated on October 21, 1963, that "[a]ll of us seem to think that this man does have a significant limitation of activity from the ankylosis (stiffness or fixation of a joint by disease or surgery) of this elbow. * * * His back does seem to be troubling him and he probably does have something there as the result of an old injury; however, we were unable to detect enough in the way of findings to account for his present degree of disability. We feel his work capacity is best determined by how much his elbow limits him."

Dr. Bernard C. Murdock, a vocational expert, testified at a second hearing that after considering all the evidence in the first hearing that he believed there were a number of jobs for which plaintiff would qualify. Specifically, he mentioned work as a bag cutter, bag sealer, band cutter, lining cutter-outer, flyleaf turner, garter inserter, inserter, rag sorter, smoking-pipe liner, visera washer, and watchman. [It appears that he forgot to add to the list the selling of apples or peaches on the corner. Cf. Thomas v. Celebrezze, 331 F.2d 541, 546 (4th Cir. 1964); Bates v. Celebrezze, 234 F.Supp. 349, 353 (W.D.S.C.1964).] Doctor Murdock added that these jobs are primarily available in various manufacturing industries found in the economy, and that they would require a minimum of general educational development and aptitudes, light physical exertion, and only a short demonstration to learn. By way of clarification, he pointed out that although the opportunity for such work existed within 60 miles of plaintiff's home, he could not testify as to whether plaintiff would actually be hired by particular employers.

The only issue to be determined is whether or not the Secretary's determination is supported by substantial evidence. If it is, the Court must accept this determination. However, there is a duty on the Court to scrutinize the "record as a whole" to ascertain if the conclusion reached is rational. But

if undue reliance has been placed "upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary." Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964); Bates v. Celebrezze, 234 F.Supp. 349, 353 (W.D.S.C.1964).

There is, as noted before, some conflict in the evidence. The Act gives the Secretary the right and the duty to weigh this evidence and to place a reasonable interpretation thereon. Id. It is obvious that the Secretary's decision is based on "some" evidence, but viewing the "record as a whole" it is clear that the Secretary's decision is not based upon substantial evidence, and it appears that undue emphasis has been placed on one portion of the record.

The Hearing Examiner relied heavily on the testimony of Doctor Murdock, the vocational expert, to the effect that plaintiff could obtain certain enumerated jobs in the general locale of his home, taking into account his physical condition, education, background, work experience, and other factors. But it is to be noted that Doctor Murdock, on cross-examination, when asked of the possibility of plaintiff's being able to obtain the enumerated jobs said:

"A. As the attorney says, it is improbable, however that even though they exist there that he could get them.

"Q. You say the jobs do exist but you do not say that he would be able to get such a job?

"A. That's correct.

"Q. It's your testimony that the opportunity exists but you are not testifying that there is a job that he could get?

"A. That is correct."

 It would appear that this testimony reveals the "ivory tower" view of the witness. Because the law is clear, the evidence must be considered in terms of the individual claimant. It does not make any difference whether or not an "abstract man" with certain features or

limitations could obtain and maintain substantial gainful activity, but the *individual*, whomever he is. Thomas v. Celebrezze, supra, at 545; Bates v. Celebrezze, supra, at 354.

This is what the Secretary has overlooked. "Employment opportunities must be actually and not merely theoretically available," Hanes v. Celebrezze, 337 F.2d 209, 215 (4th Cir. 1964), to the person under consideration.

It is clear from the record, viewed as a whole, that plaintiff is not capable of substantial gainful activity within the meaning of the Act, and that such incapacity exists because of a physical disability which can be expected "to be of long-continued and indefinite duration."

Accordingly, the decision of the Secretary is reversed and judgment will be entered for plaintiff.

And it is so ordered.